Michael A. Sirignano, Esq.
Barry I. Levy, Esq.
Jennifer Abreu, Esq.
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs Government Employees*
*Insurance Company, GEICO Indemnity Company,*
*GEICO General Insurance Company and*
*GEICO Casualty Company*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
GOVERNMENT EMPLOYEES INSURANCE
COMPANY, GEICO INDEMNITY COMPANY,
GEICO GENERAL INSURANCE COMPANY and
GEICO CASUALTY COMPANY,                                              Docket No.: _____(      )

                          Plaintiffs,

              -against-


NYRX PHARMACY INC.,
YURIY AVULOV,
AND JOHN DOE NOS. "1" THROUGH "5,"

                          Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X


## COMPLAINT

Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company,

GEICO General Insurance Company and GEICO Casualty Company (collectively, "GEICO" or

"Plaintiffs"), as and for their Complaint against Defendants, NYRX Pharmacy, Inc., Yuriy

Avulov, and John Doe Nos. "1" through "5" (collectively, the "Defendants"), hereby allege as

follows:

## NATURE OF THE ACTION

1.        This action seeks to terminate an on-going fraudulent scheme perpetrated against GEICO by the Defendants who have exploited the New York "No-Fault" insurance system by submitting more than $4.6 million in fraudulent billing to GEICO for medically unnecessary pharmaceuticals dispensed to individuals involved in automobile accidents and eligible for insurance coverage under policies of insurance issued by GEICO (the "Insureds").

2.        The fraudulent scheme was spearheaded by Yuriy Avulov ("Avulov") who used, and continues to use, NYRX Pharmacy, Inc. ("NYRX Pharmacy") to submit thousands of fraudulent No-Fault insurance charges seeking payment for a set of specifically targeted, medically unnecessary "pain relieving" topical pain prescription drug products, primarily in the form of Diclofenac Sodium Gel, Lidocaine 5% Ointment and Lidocaine 5% Patches (collectively, the "Fraudulent Topical Pain Products"), as well as various oral medications, primarily in the form of oral pain relievers and muscle relaxants (together with the Fraudulent Topical Pain Products, the "Fraudulent Pharmaceuticals").

3.        To effectuate the scheme, NYRX Pharmacy and its owner Avulov (collectively, the "Pharmacy Defendants") entered into illegal, collusive agreements with prescribing healthcare providers (collectively, the "Prescribing Providers") and unlicensed laypersons (the "Clinic Controllers") who work at or are associated with various multidisciplinary medical clinics that almost exclusively treat No-Fault patients (the "No-Fault Clinics"). Pursuant to these illegal, collusive agreements, the Pharmacy Defendants steered the Prescribing Providers and Clinic Controllers to prescribe and direct large volumes of prescriptions for the targeted Fraudulent Topical Pain Products to NYRX Pharmacy, in place of other effective, but much less costly prescription and non-prescription drug products.

4.      The Pharmacy Defendants intentionally dispensed the targeted pharmaceutical products without regard to genuine patient care in order to financially enrich themselves through egregiously inflated charges submitted to GEICO. For example, billing from NYRX Pharmacy typically ranged from $1,179.00 to $2,358.00 for a single tube of Diclofenac Gel 3%, with charges at times exceeding $3,500.00 for a single tube; from $380.50 to $1,522.00 for a single tube of Lidocaine 5% Ointment, with charges at times exceeding $1,900.00; and from $308.10 to $925.20 for a prescription of Lidocaine 5% Patch.

5.      The Pharmacy Defendants' scheme not only inflated the charges submitted to GEICO and other insurers, but also posed serious risks to the patients' health as the Fraudulent Pharmaceuticals were prescribed and dispensed in predetermined fashion, without regard to genuine patient care, and without regard to proper documentation or with documentation that was inconsistent with the medications actually prescribed and dispensed.

6.      By this action, GEICO seeks to recover more than $434,000.00 that the Pharmacy Defendants stole from it, along with a declaration that GEICO is not legally obligated to pay reimbursement to NYRX Pharmacy of over $3,441,000.00 in pending fraudulent No-Fault claims that the Pharmacy Defendants submitted or caused to be submitted through NYRX Pharmacy because:

(i)      NYRX Pharmacy billed for pharmaceutical products that were prescribed and dispensed pursuant to predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care;

(ii)     the Pharmacy Defendants participated in illegal, collusive relationships in which the Pharmacy Defendants steered the Prescribing Providers and Clinic Controllers to direct illegal prescriptions for the Fraudulent Pharmaceuticals to NYRX Pharmacy in exchange for unlawful kickbacks and other financial incentives;

(iii)    the Pharmacy Defendants intentionally targeted a specific set of pharmaceutical products (i.e., the Fraudulent Topical Pain Products) that NYRX Pharmacy dispensed in large volumes to Insureds with exorbitant charges, in place of other effective, less costly pharmaceuticals in order to inflate the charges to GEICO; and

(iv)    the Pharmacy Defendants made and continue to make false and fraudulent misrepresentations to GEICO by submitting or causing to be submitted charges for the Fraudulent Pharmaceuticals dispensed by NYRX Pharmacy pursuant to illegal, invalid and duplicitous prescriptions.

7.    The Defendants fall into the following categories:

(i)    NYRX Pharmacy is a New York corporation engaged in a fraudulent scheme in which it dispensed the Fraudulent Pharmaceuticals in order to submit to GEICO and other New York automobile insurers claims for reimbursement of No-Fault Benefits to which it is not entitled;

(ii)    Avulov is the record owner of NYRX Pharmacy; and

(iii)    John Doe Nos. "1" through "5" are persons and entities, presently not identifiable, who along, with the Pharmacy Defendants, participated in the operation and control of NYRX Pharmacy, including facilitating the illegal, collusive agreements with the Prescribing Providers and Clinic Controllers.

8.    The Pharmacy Defendants' scheme began in 2018. As discussed more fully below, the Pharmacy Defendants at all times have known that: (i) the billed-for pharmaceutical products were prescribed and dispensed pursuant to predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care; (ii) the Pharmacy Defendants participated in illegal, collusive agreements in which they steered the Prescribing Providers and Clinic Controllers to direct illegal prescriptions for the Fraudulent Pharmaceuticals to NYRX Pharmacy in exchange for unlawful kickbacks and other financial incentives; (iii) the Pharmacy Defendants intentionally targeted a specific set of pharmaceutical products (i.e., the Fraudulent Topical Pain Products) that NYRX Pharmacy dispensed in large volumes to Insureds with exorbitant charges, in place of other effective, less costly

pharmaceuticals; and (iv) the Pharmacy Defendants made and continue to make false and fraudulent misrepresentations to GEICO by submitting or causing to be submitted charges for the Fraudulent Pharmaceuticals dispensed by NYRX Pharmacy pursuant to illegal, invalid, and duplicitous prescriptions.

9.      Based on the foregoing, NYRX Pharmacy does not now have – and has never had – any right to be compensated for the Fraudulent Pharmaceuticals allegedly dispensed to GEICO Insureds. The chart attached hereto as Exhibit "1" sets forth the fraudulent claims that have been identified to date which the Pharmacy Defendants submitted, or caused to be submitted, to GEICO using the United States mails. As a result of the Pharmacy Defendants' scheme, GEICO has incurred damages of approximately $434,000.00.

## THE PARTIES

**I.    Plaintiffs**

10.     Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company are Maryland corporations with their principal places of business in Chevy Chase, Maryland. GEICO is authorized to conduct business and to issue automobile insurance policies in New York.

**II.   Defendants**

11.     Defendant NYRX Pharmacy is a New York corporation, incorporated on or about June 19, 2018, with its principal place of business at 179-07 Union Turnpike, Fresh Meadows, New York.

12.     NYRX Pharmacy was registered as a pharmacy with the New York State Department of Education on August 17, 2018, but is no longer registered as an active pharmacy.

5

13.     NYRX Pharmacy and its owner Avulov, knowingly submitted, and continue to submit through the present day, fraudulent claims to GEICO for pharmaceuticals purportedly dispensed to GEICO Insureds and continue to seek reimbursement on unpaid fraudulent claims.

14.     Defendant Avulov resides in and is a citizen of New York and is the record owner of NYRX Pharmacy.

15.     John Doe Nos. 1-5 reside in and are citizens of New York.  John Doe Nos. 1-5 are individuals and entities, presently not identifiable, who, along with the Pharmacy Defendants, participate in the operation and control of NYRX Pharmacy, including facilitating illegal, collusive agreements with the Prescribing Providers and Clinic Controllers, whereby they prescribe, or purport to prescribe, the Fraudulent Pharmaceuticals in exchange for kickbacks and other financial incentives from the Pharmacy Defendants.

## JURISDICTION AND VENUE

16.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the controversy exceeds the sum or value of $75,000.00, exclusive of interests and costs, and is between citizens of different states. Pursuant to 28 U.S.C. § 1331, this Court also has jurisdiction over the claims brought under 18 U.S.C. §§ 1961 et seq., the Racketeer Influenced and Corrupt Organizations ("RICO") Act, because they arise under the laws of the United States.  In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

17.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Eastern District of New York is the District where one or more of the Defendants reside and because this is the District where a substantial amount of the activities framing the basis of the Complaint occurred.

## ALLEGATIONS COMMON TO ALL CLAIMS

### I. An Overview of New York's No-Fault Laws

18.     GEICO underwrites automobile insurance in the State of New York.

19.     New York's "No-Fault" laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the healthcare services that they need. Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101 et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§ 65 et seq.)(collectively, referred to herein as the "No-Fault Laws"), automobile insurers are required to provide Personal Injury Protection Benefits ("No-Fault Benefits") to Insureds.

20.     No-Fault Benefits include up to $50,000.00 per Insured for necessary expenses that are incurred for health care goods and services.

21.     The No-Fault Laws limit reimbursement for benefits to prescription drugs only. Over-the-counter drugs and products which may be purchased without prescription are not covered expenses under the No-Fault Laws.

22.     An Insured can assign his or her right to No-Fault Benefits to the providers of healthcare services in exchange for those services. Pursuant to a duly executed assignment, a healthcare provider may submit claims directly to an insurance company and receive payment for necessary goods and medical services provided, using the claim form required by the New York State Department of Insurance (known as the "Verification of Treatment by Attending Physician or Other Provider of Health Service," or, more commonly, as an "NF-3"). In the alternative, healthcare providers sometimes submit claims using the Health Care Financing Administration insurance claim form (known as the "HCFA-1500 Form").

7

23.     Pursuant to New York's No-Fault Laws (11 N.Y.C.R.R. § 65-3.16(a)(12)), a healthcare provider is not eligible to receive No-Fault Benefits if it fails to meet any applicable New York state or local licensing requirement necessary to perform such services in New York.

24.     The implementing regulation adopted by the Superintendent of Insurance, 11 NYCRR § 65-3.16(a)(12), provides, in pertinent part, as follows:

> A provider of health care services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet any applicable New York State or local dispensing requirement necessary to perform such service in New York … (emphasis supplied).

25.     In State Farm Mut. Auto. Ins. Co. v. Mallela, 4 N.Y.3d 313 (2005), the New York Court of Appeals, confirmed that healthcare service providers that fail to comply with licensing requirements are ineligible to collect No-Fault Benefits, and that insurers may look beyond a facially-valid license to determine whether there was a failure to abide by state and local law.

26.     Pursuant to New York Insurance Law § 403, the NF-3s and HCFA-1500 Forms submitted by a healthcare provider to GEICO, and to all other automobile insurers, must be verified by the healthcare provider subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

## II.     An Overview of Applicable Licensing Requirements

27.     Pursuant to New York Education Law § 6808, no person, firm, corporation or association shall possess drugs, prescriptions or poisons for the purpose of compounding, dispensing, retailing, wholesaling or manufacturing, or shall offer drugs, prescriptions or poisons for sale at retail or wholesale unless registered by the New York State Department of Education as a pharmacy, wholesaler, manufacturer or outsourcing facility.

28.     Pursuant to 8 N.Y.C.R.R. § 29.1, pharmacies in New York are prohibited from "exercising undue influence on the patient or client, including the promotion of the sale of services, goods, appliances or drugs in such manner as to exploit the patient or client for the financial gain of the practitioner or of a third party."

29.     Pursuant to 8 N.Y.C.R.R. § 63.1(7), pharmacists shall conduct a prospective drug review before each prescription is dispensed, which review shall include screening for potential drug therapy problems due to therapeutic duplication, drug-drug interactions, including serious interactions with over-the-counter drugs, incorrect drug dosage or duration of drug treatment, drug-allergy interactions, and clinical abuse or misuse.

30.     Pursuant to 8 N.Y.C.R.R. § 29.1, pharmacies are prohibited from "directly or indirectly offering, giving, soliciting, or receiving or agreeing to receive, any fee or other consideration to or from a third party for the referral of a patient or client or in connection with the performance of professional services."

31.     New York Education Law § 6810 prohibits pharmacies from dispensing pharmaceuticals when a prescription form for a drug includes any other drug. Separate prescriptions are required for each drug prescribed and dispensed.

32.      New York Education Law § 6810 prohibits persons and corporations, not licensed to issue a prescription, to willfully cause prescription forms, blanks, or facsimiles thereof to be disseminated to any person other than a person who is licensed to issue a prescription.

33.     Pursuant to Education Law § 6512, §6530(11), (18), and (19), aiding and abetting an unlicensed person to practice a profession, offering any fee or consideration to a third party

for the referral of a patient, and permitting any person not authorized to practice medicine to share in the fees for professional services is considered a crime and/or professional misconduct.

34.     New York Education Law § 6530(17) prohibits a physician from "exercising undue influence" on the patient by promoting the sale of drugs so as to exploit the patient for the financial gain of the licensee or of a third party.

35.     New York Education Law § 6530(18) prohibits a physician from "directly or indirectly" offering, giving, soliciting, receiving or agreeing to receive any fee or other consideration to or from a third party in connection with the performance of professional services.

36.     New York Education Law § 6509-a prohibits a professional licensee from "directly or indirectly" requesting, receiving, or participating in the division, transference, assignment, rebate, splitting or refunding of a fee in connection with professional care or services related to drugs and/or medications.

37.     Pursuant to New York Education Law § 6808, pharmacy owners and supervising pharmacists shall be responsible for the proper conduct of a pharmacy.

## III.    The Pharmacy Defendants' Scheme Involving the Fraudulent Pharmaceuticals

### A.    Overview of the Scheme

38.     Beginning in 2018, and continuing uninterrupted through the present day, the Pharmacy Defendants masterminded and implemented a fraudulent scheme in which they used NYRX Pharmacy to exploit patients for financial gain by billing the New York automobile insurance industry millions of dollars in exorbitant charges seeking reimbursement relating to the Fraudulent Pharmaceuticals purportedly dispensed to the Insureds.

39.     NYRX Pharmacy purported to be a storefront neighborhood pharmacy operating in Fresh Meadows, Queens, when in fact, it operated as a large-scale fraudulent scheme that exploited GEICO's Insureds, as well as insureds of other New York automobile insurers, through the prescribing and dispensing of the Fraudulent Pharmaceuticals, while intentionally disregarding a vast array of other pharmaceutical products, including over-the-counter ("OTC") medications readily available at a fraction of the cost.

40.     Unlike legitimate pharmacies dispensing a variety of pharmaceutical products, NYRX Pharmacy intentionally focused on and targeted a specific set of pharmaceutical products (i.e., the Fraudulent Topical Pain Products), which make up about 92% of the billing that the Pharmacy Defendants submitted to GEICO for reimbursement.

41.     While about 92% of the billing that the Pharmacy Defendants submitted through NYRX Pharmacy was for the Fraudulent Topical Pain Products, the remaining billing submitted was primarily for oral pain-relieving medication, including nonsteroidal anti-inflammatory drugs ("NSAIDs") and muscle relaxers submitted as part of the scheme to defraud GEICO.

42.     The Pharmacy Defendants chose to target the Fraudulent Topical Pain Products because they knew that (i) similar over-the-counter drugs that could be recommended to Insureds are not covered expenses under the No-Fault Laws and (ii) they could acquire the Fraudulent Topical Pain Products at low cost and submit claims for reimbursement under the No-Fault Laws at exorbitant prices.

43.     In furtherance of the fraudulent scheme, the Pharmacy Defendants steered the Prescribing Providers and the Clinic Controllers to prescribe and direct large volumes of prescriptions to NYRX Pharmacy for the targeted set of Fraudulent Topical Pain Products, which were purportedly prescribed and dispensed to treat patients at the No-Fault Clinics.

44.     Many of the No-Fault Clinics where the prescriptions steered to NYRX Pharmacy were generated included clinics that housed a "revolving door" of numerous other purported healthcare providers geared towards exploiting New York's No-Fault insurance system.

45.     NYRX Pharmacy received large volumes of medically unnecessary prescriptions from the Prescribing Providers and the Clinic Controllers at the No-Fault Clinics almost immediately after NYRX Pharmacy became registered to operate, despite the fact that NYRX Pharmacy was a new pharmacy, its owner was not a pharmacist, and it had no reputation or track record in the pharmacy industry.

46.     The Pharmacy Defendants obtained large volumes of medically unnecessary prescriptions from the Prescribing Providers and the Clinic Controllers at the No-Fault Clinics pursuant to predetermined protocols, in exchange for the payment of kickbacks or other financial incentives, solely to maximize profits and without regard to genuine patient care.

47.     In some instances, the Prescribing Providers were supplied what is essentially a product list – disguised as a "prescription order form" (the "Fraudulent Prescription Forms") – of the various Fraudulent Pharmaceuticals that NYRX Pharmacy dispensed.

48.     The Fraudulent Prescription Forms are invalid and illegal in that they are not electronic prescriptions nor are they official serialized New York State prescriptions bearing the legible, conspicuous imprinted or stamped name of the authorized prescribing healthcare provider.

49.     Some of the Fraudulent Prescription Forms created by the Pharmacy Defendants listed NYRX Pharmacy's name, address, and contact information, along with the names of the Fraudulent Pharmaceuticals, including the Fraudulent Topical Pain Products and the quantity in which they were to be prescribed and dispensed to Insureds.

50.     In other instances, the Fraudulent Prescription Forms submitted by the Pharmacy Defendants to GEICO listed another pharmacy's name, address, and contact information, not NYRX Pharmacy.

51.     The other pharmacy whose name appeared on the Fraudulent Prescription Forms in some instances was Wellmart Rx, Inc. ("Wellmart Rx").

52.     Wellmart Rx  was a named defendant in a federal affirmative action commenced by GEICO captioned, GEICO v. Wellmart Rx, Inc., et al, 1:19-CV-04414 (KAM)(RLM) (E.D.N.Y. 2019) (the "Wellmart Rx matter").  In the Wellmart Rx matter, similar to the fraudulent scheme described herein, GEICO alleged that Wellmart Rx, among other defendants, stole from GEICO by submitting, or causing to be submitted thousands of fraudulent No-Fault insurance claims seeking reimbursement for pharmaceutical products.

53.     While NYRX Pharmacy purports to operate as a separate and distinct pharmacy from Wellmart Rx, in some instances, NYRX Pharmacy submitted billing to GEICO that listed Wellmart Rx's address, instead of its own address.  Further, on at least one occasion, an insurance check made payable to NYRX Pharmacy was deposited into Wellmart Rx's bank account. Moreover, both NYRX Pharmacy and Wellmart Rx made payments to Statewide Employment Professionals, Inc. ("Statewide Employment'), a New York corporation that appears to have no legitimate purpose but which received payments from entities that were indicted by the Brooklyn District Attorney's Office for allegedly participating in a healthcare fraud scheme wherein patients were paid in cash in exchange for going to clinics for medically unnecessary treatment.

54.     Although Wellmart Rx purportedly ceased its operation in May of 2019, NYRX Pharmacy filled and dispensed pharmaceutical drug products pursuant to Wellmart Rx's

Fraudulent Prescription Forms. Furthermore, Wellmart Rx's former pharmacist, Cyril Gulian became NYRX Pharmacy's supervising pharmacist.

55.     The Fraudulent Prescription Forms, including Wellmart Rx's Fraudulent Prescription Forms that were filled by NYRX Pharmacy, steered the Prescribing Providers to prescribe predetermined Fraudulent Topical Pain Products such as Diclofenac Gel 3%, Lidocaine 5% Ointment, and/or Lidocaine 5% Patch (or its equivalent, Lidoderm 5% Patch), which NYRX Pharmacy thereafter billed at exorbitant charges.

56.     Additionally, the Fraudulent Prescription Forms also steered the Prescribing Providers to prescribe other Fraudulent Pharmaceuticals, including predetermined oral medications, such as Naproxen and Celebrex to further increase NYRX Pharmacy's profits. The Prescribing Providers chose which predetermined pharmaceutical product should be given to the Insured by marking off or circling one of the designed boxes on the prescription form.

57.     A sample of the prescriptions issued by the Prescribing Providers using the Fraudulent Prescription Forms, which the Pharmacy Defendants submitted to GEICO in support of NYRX Pharmacy's fraudulent billing, is annexed hereto as Exhibit "2".

58.     The Prescribing Providers also were provided in some instances with preset labels or rubber stamps that contained the names of some of the Fraudulent Pharmaceuticals.  The Prescribing Providers then used the preset labels or stamps on their official New York State prescription pads to prescribe the Fraudulent Pharmaceuticals to the Insureds that were dispensed by NYRX Pharmacy

59.     The preset label or rubber stamps steered the Prescribing Providers to prescribe predetermined Fraudulent Topical Pain Products, particularly Diclofenac Gel 3% and Lidocaine 5% Ointment, which was then dispensed by NYRX Pharmacy.

60.     A sample of prescriptions issued by the Prescribing Providers using preset labels or rubber stamps, which NYRX Pharmacy submitted to GEICO in support of its fraudulent billing, is annexed hereto as Exhibit "3".

61.     In keeping with the fact that the Pharmacy Defendants illegally steered the Prescribing Providers and the Clinic Controllers to provide NYRX Pharmacy with prescriptions for the Fraudulent Pharmaceuticals pursuant to predetermined fraudulent protocols and solely to maximize profits, the Insureds were not given the prescriptions to fill (even though many of the prescriptions were paper prescriptions) and they were not given the option to use a pharmacy of their choosing.

62.     The Pharmacy Defendants ensured that the Prescribing Providers and Clinic Controllers directed the prescriptions for the Fraudulent Pharmaceuticals to NYRX Pharmacy, regardless of (i) the distance of the pharmacy to the Insureds' residences or the No-Fault Clinics where the Insureds were receiving treatment and (ii) the fact that there were countless other pharmacies located much closer to the Insured's residences and the No-Fault Clinics.

63.     Notably, approximately 55% of the Insureds that allegedly received pharmaceuticals dispensed by NYRX Pharmacy lived outside of Queens, New York, where the pharmacy is located, with a majority of the Insureds' residences scattered throughout Brooklyn, Bronx, Manhattan, Staten Island and Long Island, including Nassau and Suffolk County.

64.     In some instances, the Insureds' residences are located in cities and counties outside of New York City, including Albany, Westchester County, Rockland County, Sullivan County, Orange County, Clinton County, Dutchess County, Onondaga County, Rensselaer County, Saratoga Springs, and Oneida County, with some residences located more than 150 miles away from NYRX Pharmacy.

65.     But for the Pharmacy Defendants' illegal, collusive agreements with the Prescribing Providers and Clinic Controllers, these Insureds would not have received pharmaceutical products from a pharmacy that is located in a county or city outside of their place of residence.

66.     Instead, the Prescribing Providers and the Clinic Controllers directed prescriptions for the Fraudulent Pharmaceuticals to NYRX Pharmacy, irrespective of its inconvenient location to the Insureds' residences because the prescriptions were being issued pursuant to illegal, collusive agreements between the Pharmacy Defendants and the Prescribing Providers and Clinic Controllers.

67.     The Pharmacy Defendants used the prescriptions obtained from the No-Fault Clinics to bill GEICO and other insurers millions of dollars for the Fraudulent Pharmaceuticals.

68.     The Pharmacy Defendants billed GEICO more than $4.6 million, with more than $4 million of that billing being submitted in only one year of active operations by NYRX Pharmacy.

69.     Upon information and belief, considering that GEICO is only one of many automobile insurers in New York, NYRX Pharmacy likely billed the New York automobile industry in excess of $10 million for the Fraudulent Pharmaceuticals, with substantially all of that billing taking place in a single year.

70.     NYRX Pharmacy, after a flurry of billing to GEICO and other New York automobile insurers, shut down active operations and terminated NYRX Pharmacy's registration with New York State Department of Education.

71.     Nevertheless, as a further part of the scheme, the Pharmacy Defendants continue their scheme by hiring law firms to pursue collection on the fraudulent charges submitted to

GEICO by NYRX Pharmacy, through numerous, separate no-fault arbitration or civil court collection proceedings seeking recovery on the individual bills, which proceedings may continue for years.

72.     The Pharmacy Defendants' continued collection efforts through numerous, separate no-fault arbitration or civil court collection proceedings is an essential part of their fraudulent scheme since they know it is impractical for an arbitrator or civil court judge in a single no-fault arbitration or civil court proceeding, typically involving a single bill, to uncover or address the Pharmacy Defendants' large scale, complex fraud scheme involving the prescription and dispensing of fraudulent pharmaceuticals to hundreds of patients across numerous different No-Fault Clinics located throughout the New York metropolitan area.

73.     The Pharmacy Defendants masterminded and implemented their pharmaceutical fraud scheme and recruited the Prescribing Providers and Clinic Controllers as willing participants, knowing that: (i) the Fraudulent Pharmaceuticals were prescribed and dispensed pursuant to predetermined protocols designed to exploit the patients for financial gain, without regard to genuine patient care; (ii) the Fraudulent Pharmaceuticals were the product of illegal, collusive agreements intended to inflate the billing from NYRX Pharmacy to insurers and financially enrich the Pharmacy Defendants; (iii) the Pharmacy Defendants intentionally targeted a specific set of pharmaceutical products that they dispensed in large volumes to Insureds through NYRX Pharmacy with exorbitant charges; and (iv) the Fraudulent Pharmaceuticals were prescribed and dispensed without regard for the availability of a wide range of OTC medications proven to have therapeutic effects and available at a fraction of the case.

**B.  The Fraudulent Pharmaceuticals Were Prescribed and Dispensed Without Regard to Genuine Patient Care**

74.     In basic terms, the goal of medical treatment is to help patients get better in a timely manner.  Notwithstanding this basic goal, Insureds treated by the Prescribing Providers at No-Fault Clinics associated with the Clinic Controllers – and who received pharmaceuticals from NYRX Pharmacy – were virtually always subjected to a predetermined and unnecessarily prolonged treatment protocol, which completely lacks in individualized care and fails to utilize evidence-based medicine practices with the goal of the Insureds' timely return to good health.

75.     Despite this basic goal, the treatment reports almost uniformly reflect that the Insureds do not get better, do not return to good health, and/or do not experience improvement in their conditions such that the Insureds can terminate medical treatment expeditiously and return to normal activity.

76.     Rather, as part of the predetermined protocol, the Prescribing Providers produced generic, and boilerplate examination reports designed to justify continued, voluminous and excessive healthcare services that the No-Fault Clinic providers purport to render to Insureds.  These healthcare services include the prescription of excessive amounts of medically unnecessary pharmaceutical drug products such as the Fraudulent Pharmaceuticals.

77.     Notwithstanding the creation of the examination reports, the Prescribing Providers' prescription of the Fraudulent Pharmaceuticals dispensed by NYRX Pharmacy was based on predetermined protocols designed to exploit the Insureds for financial gain, without regard to the genuine needs of the patients.

78.     To the extent any examination was actually performed at all, the Prescribing Providers failed to document a detailed medical history of the patients to whom they prescribed the Fraudulent Pharmaceuticals that were dispensed by NYRX Pharmacy.

18

79.     Prescribing a multitude of pharmaceutical drug products without first taking a detailed patient history demonstrates a gross indifference to patient health and safety as the Prescribing Providers often did not know whether the patient was taking any medication or suffering from any co-morbidity that would contraindicate the use of a particular prescribed drug product.

80.     The Prescribing Providers also did not document in their examination reports whether the patients was intolerant of oral medications thereby necessitating a prescription for a Fraudulent Topical Pain Product.

81.     The Prescribing Providers also failed to document in their follow-up examination reports whether the Fraudulent Pharmaceuticals dispensed by NYRX Pharmacy provided any relief to the patient or whether the patient experienced any side effects associated with the prescribed pharmaceutical product.

82.     At times, the Prescribing Providers failed to document in any of their examination reports that the patient was to receive a Fraudulent Pharmaceutical. At other times, the recommendation and treatment plans of a Prescribing Provider's examination report were inconsistent with the medications actually prescribed and dispensed. For example,

- Insured B.J. was allegedly involved in a motor vehicle accident on June 14, 2019. Thereafter, B.J. sought treatment with Rutland Medical, P.C. at a No-Fault Clinic located at 135-25 79th Street, Howard Beach, New York, and underwent an initial examination with Ilonna Yelizar, P.A. ("Yelizar") on June 20, 2019. Yelizar did not document any medication under the treatment plan section of the examination report, thereby, indicating that no medication was prescribed. Nevertheless, on July 11, 2019, about three weeks later, NYRX Pharmacy dispensed and billed for Lidocaine 5% Ointment pursuant to a prescription dated June 20, 2019 by Yelizar.

- Insured L.S. was allegedly involved in a motor vehicle accident on May 24, 2019. Thereafter, L.S. sought treatment with QR Medical Services, P.C. at a No-Fault Clinic located at 148-21 Jamaica Avenue, Jamaica, New York, and underwent an initial examination with Muhammad Reza Zakaria, M.D. ("Dr. Zakaria") on June 14, 2019. Dr. Zakaria did not document any medication under the treatment plan section of the

examination report, thereby, indicating that no medication was prescribed. On July 31, 2019, over <u>one month later</u>, NYRX Pharmacy dispensed and billed for Lidocaine 5% Ointment and Celecoxib pursuant to prescriptions dated July 19, 2019 by Dr. Zakaria. Notably, there is no indication that Dr. Zakaria examined L.S. on or about July 19, 2019.

- Insured T.B. was allegedly involved in a motor vehicle accident on June 10, 2019. Thereafter, T.B. sought treatment with Ananthakumar Thillainathan, M.D. ("Dr. Thillainathan") at a No-Fault Clinic located at 1849 Utica Avenue, Brooklyn, New York, and underwent an initial examination on June 20, 2019. Dr. Thillainathan documented the prescription of Diclofenac Gel 1% under the treatment plan section of his examination report. Nevertheless, on June 25, 2019, NYRX Pharmacy dispensed and billed for Diclofenac Gel 3% pursuant to a prescription dated June 20, 2019 by Dr. Thillainathan.

- Insured N.A. was allegedly involved in a motor vehicle accident on July 31, 2019. Thereafter, N.A. sought treatment with Time to Care Medical, P.C. at a No-Fault Clinic located at 222-01 Jamaica Avenue, Queens Village, New York, and underwent an initial examination with Rafael Antonio Delacruz-Gomez ("Dr. Delacruz-Gomez") on August 1, 2019. Dr. Delacruz-Gomez circled "compound" under the pre-printed treatment plan section of the examination report but failed to name any prescribed compound medication. Nevertheless, on August 5, 2019, NYRX Pharmacy dispensed and billed for Diclofenac Gel 3% pursuant to a prescription dated August 1, 2019 with one refill by Dr. Delacruz-Gomez.

- Insured J.M. was allegedly involved in a motor vehicle accident on May 9, 2018. Thereafter, J.M. sought treatment with University Pain Medicine at a No-Fault Clinic located at 215-19 39th Avenue, Bayside, New York, and underwent an initial examination with Didier Demesmin, M.D. ("Dr. Demesmin") on April 12, 2019. On August 2, 2019, J.M. underwent a follow-up examination with Dr. Demesmin, at which point he documented Diclofenac Gel as the prescribed medication under the treatment plan section of the examination report. Nevertheless, on August 5, 2019, NYRX Pharmacy dispensed and billed for Lidocaine 5% Patch pursuant to a prescription dated August 2, 2019 with one refill by Dr. Demesmin.

- Insured F.L.was allegedly involved in a motor vehicle accident on July 9, 2018. Thereafter, F.L. sought treatment with Epione Medical, P.C. at a No-Fault Clinic located at 92-08 Jamaica Avenue, Woodhaven, New York, and underwent an initial examination with Michael Yakubov Jacobi, M.D. ("Dr. Jacobi") on July 12, 2018. On October 11, 2018, F.L. underwent a follow-up examination with Mihaela Dajdea, P.A. ("Dajdea"), at which point she marked Tylenol as the prescribed medication under the pre-printed treatment plan section of the examination report. Yet, on October 12, 2018, NYRX Pharmacy dispensed and billed for Diclofenac Gel 3% pursuant to a prescription dated October 11, 2018 by Dajdea.

- Insured H.L. was allegedly involved in a motor vehicle accident on February 28, 2019. Thereafter, H.L. sought treatment with BL Pain Management PLLC at a No-Fault Clinic located at 34-09 Murray Street, Flushing, New York, and underwent an initial

examination with Boleslav Kosharsky, M.D. ("Dr. Kosharsky") on April 17, 2019. Dr. Kosharky <u>only</u> documented Diclofenac Gel as the prescribed medication under the treatment plan section of the examination report. Nevertheless, on April 30, 2019, NYRX Pharmacy dispensed and billed for Diclofenac Gel 3% <u>and</u> Lidocaine 5% Patch pursuant to a Fraudulent Prescription Form dated April 17, 2019 and allegedly signed by Dr. Kosharsky.

83.     Notably, each year approximately 4.5 million ambulatory care visits and 100,000 deaths in the United States occur as a result of adverse drug reactions. A substantial number of these adverse drug reactions are the result of improper prescriptions, including improper prescription practices associated with therapeutic duplication. <u>See</u>, Mathew Witry, PharmD, PhD, Medication List Discrepancies and Therapeutic Duplications Among Dual Use Veterans, Federal Practitioner, 14 (September 2016).

84.     Therapeutic duplication is the prescribing and dispensing of two or more drugs from the same therapeutic class – such as oral and topical NSAIDs (<u>e.g.</u>, Ibuprofen and Diclofenac Gel 3%) – which puts the patient at greater risk of adverse drug reactions without providing any additional therapeutic benefit.

85.     In keeping with the fact that the Fraudulent Pharmaceuticals were prescribed and dispensed without regard to genuine patient care, the Prescribing Providers issued multiple prescriptions for multiple Fraudulent Pharmaceuticals, from the same therapeutic class, on the same date to a single patient. For example:

- Insured M.V. was allegedly involved in a motor vehicle accident on July 5, 2019. Thereafter, M.V. sought treatment with Foster Medical, P.C. at a No-Fault Clinic located at 170 W. 233rd Street, Bronx, New York. On July 18, 2019, M.V. underwent an initial examination with Denny Rodriguez, M.D. ("Dr. Rodriguez") who issued prescriptions for Diclofenac Gel 3% and Ibuprofen – two drug products from the same therapeutic class – a topical and oral NSAID, as well as Cyclobenzaprine and Esomeprazole. On July 23, 2019, NYRX Pharmacy dispensed and billed for Diclofenac Gel 3%, Ibuprofen, Cyclobenzaprine, and Esomeprazole pursuant to prescriptions dated July 18, 2019 by Dr. Rodriguez.

- Insured E.J. was allegedly involved in a motor vehicle accident on August 24, 2018. Thereafter, E.J. sought treatment with Epione Medical, P.C. at a No-Fault Clinic located at 218-08 Jamaica Avenue, Queens Village, New York, and underwent an initial examination with Dr. Jacobi on September 5, 2018. On October 3, 2018, E.J. underwent a follow-up examination with Dajdea who issued prescriptions for Diclofenac Gel 3% and Ibuprofen – two drug products from the same therapeutic class – a topical and oral NSAID, as well as Lidocaine 5% Patch. On October 8, 2018, NYRX Pharmacy dispensed and billed for Diclofenac Gel 3%, Ibuprofen, and Lidocaine 5% Patch pursuant to prescriptions dated October 3, 2018 by Dajdea. On March 21, 2019, E.J. underwent another follow-up examination with Dajdea who again issued prescriptions for Diclofenac Gel 3% and Ibuprofen.  On March 27, 2019, NYRX Pharmacy dispensed and billed for Diclofenac Gel 3% and Ibuprofen pursuant to prescriptions dated March 21, 2019 by Dajdea.

- Insured R.L.G. was allegedly involved in a motor vehicle accident on May 16, 2019. Thereafter, R.L.G. sought treatment with Neighborhood Healthcare Medical, P.C. at a No-Fault Clinic located at 170 W. 233rd Street, Bronx, New York. On May 16, 2019, R.L.G. underwent an initial examination with Dr. Rodriguez who issued prescriptions for Diclofenac Gel 3% and Ibuprofen – two drug products from the same therapeutic class – a topical and oral NSAID, as well as Cyclobenzaprine and Esomeprazole.  On May 21, 2019, NYRX Pharmacy dispensed and billed for Diclofenac Gel 3%, Ibuprofen, Cyclobenzaprine, and Esomeprazole pursuant to prescriptions dated March 16, 2019 by Dr. Rodriguez.

- Insured A.M. was allegedly involved in a motor vehicle accident on January 6, 2019. Thereafter, A.M. sought treatment with Neighborhood Healthcare Medical, P.C. at a No-Fault Clinic located at 170 W. 233rd Street, Bronx, New York. On January 18, 2019, A.M. underwent an initial examination with Dr. Rodriguez who issued prescriptions for Diclofenac Gel 3% and Naproxen – two drug products from the same therapeutic class – a topical and oral NSAID, as well as Cyclobenzaprine and Esomeprazole.  Notably, Dr. Rodriguez documented the prescription of Diclofenac Gel 1%, not Diclofenac Gel 3%, in the treatment plan section of the examination report. On January 30, 2019, NYRX Pharmacy dispensed and billed for Diclofenac Gel 3%, Naproxen, Cyclobenzaprine, and Esomeprazole pursuant to prescriptions dated January 22, 2019 by Dr. Rodriguez. On February 14, 2019, A.M. underwent a follow-up examination with Dr. Rodriguez who issued prescriptions for Diclofenac Gel 3% and Lidocaine 5% Patch. On February 21, 2019, NYRX Pharmacy dispensed and billed for Diclofenac Gel 3% and Lidocaine 5% Patch pursuant to prescriptions dated February 14, 2019 by Dr. Rodriguez. On June 3, 2019, NYRX Pharmacy dispensed and billed for Lidocaine 5% Patch and Naproxen pursuant to prescriptions dated May 2, 2019 by Dr. Rodriguez. Notably, there is no corresponding examination report for the May 2, 2019 prescriptions by Dr. Rodriguez submitted to GEICO.

- Insured R.S. was allegedly involved in a motor vehicle on March 7, 2019. Thereafter, R.S. sought treatment with Neighborhood Healthcare Medical, P.C. at a No-Fault Clinic located at 170 W. 233rd Street, Bronx, New York. On March 11, 2019, R.S. underwent an

initial examination with Dr. Rodriguez who issued prescriptions for Diclofenac Gel 3% and Ibuprofen – two drug products from the same therapeutic class – a topical and oral NSAID, as well as Cyclobenzaprine and Esomeprazole. Notably, Dr. Rodriguez documented the prescription of Diclofenac Gel 1%, not Diclofenac Gel 3%, in the treatment plan section of the examination report. On March 20, 2019, NYRX Pharmacy dispensed and billed for Diclofenac Gel 3%, Ibuprofen, Cyclobenzaprine, and Esomeprazole pursuant to prescriptions dated March 11, 2019 by Dr. Rodriguez. On April 9, 2019, R.S. underwent another follow-up examination with Dr. Rodriguez who, the following day, issued prescriptions for Diclofenac Gel 3% and Celecoxib – two drug products from the same therapeutic class – a topical and oral NSAID, as well as Lidocaine 5% Patch. On April 17, 2019, NYRX Pharmacy dispensed and billed for Diclofenac Gel 3%, Celecoxib and Lidocaine 5% Patch pursuant to prescriptions dated April 10, 2019 by Dr. Rodriguez.

- Insured R.A. was allegedly involved in a motor vehicle accident on June 15, 2019. Thereafter, R.A. sought treatment with Neighborhood Healthcare Medical, P.C. at a No-Fault Clinic located at 170 W. 233rd Street, Bronx, New York. On June 17, 2019, R.A. underwent an initial examination with Dr. Rodriguez who issued prescriptions for Diclofenac Gel 3% and Ibuprofen – two drug products from the same therapeutic class – a topical and oral NSAID, as well as Cyclobenzaprine and Esomeprazole. Notably, Dr. Rodriguez documented the prescription of Diclofenac Gel 1%, not Diclofenac Gel 3%, in the treatment plan section of the examination report. On July 2, 2019, NYRX Pharmacy dispensed and billed for Diclofenac Gel 3%, Ibuprofen, Cyclobenzaprine, and Esomeprazole pursuant to prescriptions dated June 17, 2019 by Dr. Rodriguez.

- Insured R.D.R. was allegedly involved in a motor vehicle accident on September 17, 2018. Thereafter, R.D.R. sought treatment with Neighborhood Healthcare Medical, P.C. at a No-Fault Clinic located at 170 W. 233rd Street, Bronx, New York. On September 20, 2018, R.D.R. underwent an initial examination with Dr. Rodriguez who issued prescriptions for Diclofenac Gel 3% and Ibuprofen – two drug products from the same therapeutic class – a topical and oral NSAID, as well as Cyclobenzaprine and Esomeprazole. Notably, Dr. Rodriguez issued these prescriptions on October 10, 2018, over two weeks after the initial examination. Moreover, Dr. Rodriguez documented the prescription of Diclofenac Gel 1%, not Diclofenac Gel 3%, in the treatment plan section of the examination report. On October 26, 2018, NYRX Pharmacy dispensed and billed for Diclofenac Gel 3%, Ibuprofen, Cyclobenzaprine, and Esomeprazole pursuant to prescriptions dated October 10, 2018 by Dr. Rodriguez.

86.     Not only are these practices clearly part of a fraudulent scheme designed to maximize profit, but they also constitute therapeutic duplication and increase the risk of adverse drug reactions to the patients subject to them.

### C.  **The Fraudulent Diclofenac Gel and Lidocaine Ointment Prescriptions**

87.     In accordance with the fraudulent scheme discussed above, NYRX Pharmacy routinely billed GEICO for exorbitantly priced topical pain gel, namely, Diclofenac Gel 3% pursuant to duplicitous prescriptions solicited from the Prescribing Providers and Clinic Controllers, in exchange for kickbacks and other financial incentives.

88.     The Pharmacy Defendants solicited the Prescribing Providers and Clinic Controllers to provide them with voluminous prescriptions for Diclofenac Gel 3% because the Pharmacy Defendants could bill for this product at exorbitant charges, which egregiously inflated the charges submitted to GEICO and other New York No-Fault insurers.

89.     The United States Food and Drug Administration ("FDA") requires that diclofenac sodium prescriptions contain a "Black Box Warning" indicating serious cardiovascular and gastrointestinal risks.

90.     A "Black Box Warning" is the strictest warning attached to the labeling of a prescription drug or product by the FDA, and is designated to call attention to serious or life-threatening risks associated with the drug or product.

91.     Specifically, with every diclofenac sodium prescription, the FDA requires the patient to be warned that: (i) diclofenac sodium may cause an increased risk of serious cardiovascular thrombotic events, including myocardial infarction, and stroke, which can be fatal; and (ii) diclofenac sodium may cause an increased risk of serious adverse gastrointestinal events including bleeding, ulceration, and perforation of the stomach or intestines, which can be fatal.

92.     Diclofenac sodium gel, when prescribed in 1% concentrations, is a topical NSAID typically used to treat joint pain caused by osteoarthritis in the hands, wrists, elbows, knees, ankles, or feet.  It has not been proven effective for treating strains or sprains.

93.     Diclofenac Gel 3% gel, i.e., the Diclofenac Gel prescribed by the Prescribing Provider and dispensed by the Pharmacy Defendants, is FDA approved to treat a skin condition known as actinic keratoses.

94.     Diclofenac Gel 3% gel has no proven efficacy or safety in the treatment of musculoskeletal injuries, nor is the use of Diclofenac Gel to treat musculoskeletal injuries an accepted off-label use.

95.     Notwithstanding the proper and common uses for Diclofenac Gel 3%, or the risks associated with the drug, the Pharmacy Defendants steered the Prescribing Providers to prescribe diclofenac sodium in the form of Diclofenac Gel 3%, while they oftentimes recommended the patient continue the use of oral NSAIDs, or while simultaneously prescribing oral NSAIDs – such as celecoxib, meloxicam, ibuprofen, or naproxen – and other Fraudulent Pharmaceuticals such as Lidocaine 5% Patch and Lidocaine 5% Ointment.

96.     Prescribing Diclofenac Gel 3%, while simultaneously prescribing or recommending the patient take oral NSAIDs, is therapeutic duplication which results in increased risk of adverse events with no additional therapeutic benefit.

97.     Nevertheless, the Prescribing Providers consciously dispensed Diclofenac Gel 3% in conjunction with oral NSAIDs and/or other Fraudulent Topical Pain Products to numerous Insureds, despite the risks it posed to the Insureds' health and well-being.

98.     By prescribing and dispensing oral NSAIDs and other Fraudulent Topical Pain Products in conjunction with Diclofenac Gel 3%, the Prescribing Providers and the Pharmacy

Defendants engaged in therapeutic duplication and put patients at increased risk as the use of oral NSAIDs increases the "Black Box Warning" risks associated with diclofenac sodium.

99.     As evidenced by, among   other things, the contemporaneous, voluminous dispensing of pharmaceuticals and therapeutic duplication, Diclofenac Gel 3% was prescribed and dispensed without regard for patient care and safety, and instead prescribed and dispensed pursuant to collusive arrangements and predetermined treatment protocols, without regard for the commercial availability of a wide range of FDA-approved medications, as well as OTC medications, proven to have therapeutic effects and available at a fraction of the cost.

100.    In keeping with the fact that Diclofenac Gel 3% was prescribed and dispensed without regard for patient care and safety and pursuant to predetermined protocols, the initial examination reports prepared by the Prescribing Providers virtually never stated the medical basis for the prescriptions.

101.    In further keeping with the fact that Diclofenac Gel 3% was prescribed and dispensed pursuant to predetermined treatment protocols and without regard for patient care, the follow-up examination reports prepared by the Prescribing Providers virtually never addressed whether the Diclofenac Gel 3% provided any pain relief to the patient or was otherwise effective for the purpose prescribed, to what degree, or whether the patient experienced any side effects.

102.    The fact that the Prescribing Providers failed to properly document the prescriptions for Diclofenac Gel 3% further indicates that there was no legitimate medical reason for the excessive amounts of Diclofenac Gel 3% dispensed by NYRX Pharmacy, particularly given the potential for adverse health effects to the Insureds.

103.    In further keeping with the fact that the Pharmacy Defendants targeted a specific set of pharmaceuticals (i.e., the Fraudulent Topical Pain Products) pursuant to collusive

arrangements with the Prescribing Providers and Clinic Controllers and pursuant to fraudulent, predetermined and profit-driven treatment protocols, the Prescribing Providers issued prescriptions for Diclofenac Gel 3% contemporaneously to Lidocaine 5% Ointment or Lidocaine 5% Patch, at times along with NSAIDs and/or muscle relaxers. For example:

- Insured R.S. was allegedly involved in a motor vehicle accident on July 14, 2019. Thereafter, R.S. sought treatment with Colin Clarke, M.D. ("Dr. Clarke") at a No-Fault Clinic located at 221-05 Jamaica Avenue, Queens Village, New York. On July 24, 2019, R.S. underwent an examination with Dr. Clarke who issued prescriptions for Diclofenac Gel 3% and Lidocaine 5% Patch. On July 29, 2019, NYRX Pharmacy dispensed and billed for Diclofenac Gel 3% and Lidocaine 5% Patch pursuant to prescriptions dated July 24, 2019 by Dr. Clarke.

- Insured A.D. was allegedly involved in a motor vehicle accident on November 21, 2018. Thereafter, A.D. sought treatment with Neighborhood Healthcare Medical, P.C. at a No-Fault Clinic located at 170 W. 233rd Street, Bronx, New York, and underwent an initial examination with Dr. Rodriguez on December 12, 2018. On February 11, 2019, A.D. underwent a follow-up examination with Dr. Rodriguez who issued prescriptions for Diclofenac Gel 3%, Lidocaine 5% Patch, and Naproxen. On February 13, 2019, NYRX Pharmacy dispensed and billed for Diclofenac Gel 3%, Lidocaine 5% Patch and Naproxen pursuant to prescriptions dated February 11, 2019 by Dr. Rodriguez.

- Insured J.P. was allegedly involved in a motor vehicle accident on November 26, 2018. Thereafter, J.P. sought treatment with Neighborhood Healthcare Medical, P.C. at a No-Fault Clinic located at 170 W. 233rd Street, Bronx, New York. On November 28, 2018, J.P. underwent an initial examination with Dr. Rodriguez who issued prescriptions for Diclofenac Gel 3%, Naproxen, Cyclobenzaprine, and Esomeprazole. On December 19, 2018, NYRX Pharmacy dispensed and billed for Diclofenac Gel 3%, Naproxen, Cyclobenzaprine, and Esomeprazole pursuant to prescriptions dated November 28, 2018 by Dr. Rodriguez. On February 26, 2019, J.P. underwent a follow-up examination with Dr. Rodriguez who issued prescriptions for Diclofenac Gel 3%, Lidocaine 5% Patch, Naproxen, Cyclobenzaprine, and Esomeprazole. On March 4, 2019, NYRX Pharmacy dispensed and billed for Diclofenac Gel 3%, Lidocaine 5% Patch, Naproxen, Cyclobenzaprine, and Esomeprazole pursuant to prescriptions dated February 26, 2019 by Dr. Rodriguez.

- Insured R.O. was allegedly in a motor vehicle accident on February 28, 2019. Thereafter, R.O. sought treatment with Neighborhood Healthcare Medical, P.C. at a No-Fault Clinic located at 170 W. 233rd Street, Bronx, New York. On March 20, 2019, R.O. underwent an initial examination with Dr. Rodriguez who issued prescriptions for Cyclobenzaprine and Esomeprazole. On March 26, 2019, NYRX Pharmacy dispensed and billed for Cyclobenzaprine and Esomeprazole pursuant to

prescriptions dated March 20, 2019.  On April 30, 2019, R.O. underwent a follow-up examination with Dr. Rodriguez who issued prescriptions for Diclofenac Gel 3%, Lidocaine 5% Patch, Ibuprofen, Cyclobenzaprine, and Esomeprazole.  On May 2, 2019, NYRX Pharmacy dispensed and billed for Diclofenac Gel 3%, Lidocaine 5% Patch, Ibuprofen, Cyclobenzaprine, and Esomeprazole pursuant to prescriptions dated April 20, 2019 by Dr. Rodriguez.

- Insured S.W. was allegedly involved in a motor vehicle accident on April 18, 2019. Thereafter, S.W. sought treatment with Warren Street Orthopedic Rehabilitation, P.C. at a No-Fault Clinic located at 57-21 Queens Boulevard, Woodside, New York. On May 2, 2019, S.W. underwent an initial examination with Danilo Humberto Sotelo-Garza, M.D.  ("Dr. Sotelo-Garza") who issued prescriptions for Diclofenac 3% with Lidocaine 5% Ointment and Meloxicam with 1 refill for each medication. On May 5, 2019, NYRX Pharmacy dispensed and billed for Diclofenac Gel 3% with Lidocaine 5% Ointment and Meloxicam pursuant to prescriptions dated May 2, 2019 by Dr. Sotelo-Garza. Notably, Dr. Sotelo-Garza did not document the prescription of Diclofenac Gel 3% with Lidocaine 5% Ointment and Meloxicam in his examination report. Instead, Dr. Sotelo-Garza documented in his examination report that he recommended S.W. take (over-the-counter) Aleve.

- Insured D.P. was allegedly involved in a motor vehicle accident on April 24, 2019. Thereafter, D.P. sought treatment with Warren Street Orthopedic Rehabilitation, P.C. at a No-Fault Clinic located at 57-21 Queens Boulevard, Woodside, New York.  On May 2, 2019, D.P. underwent an initial examination with Dr. Sotelo-Garza who issued prescriptions for Diclofenac 3% with Lidocaine 5% Ointment with 1 refill and Meloxicam with no refill. On May 6, 2019, NYRX Pharmacy dispensed and billed for Diclofenac Gel 3% with Lidocaine 5% Ointment and Meloxicam pursuant to prescriptions dated May 2, 2019 by Dr. Sotelo-Garza. Notably, Dr. Sotelo-Garza only documented the prescription of Meloxicam in his examination report.

- Insured K.Q. was allegedly involved in a motor vehicle accident on April 13, 2019. Thereafter, K.Q. sought treatment with Warren Street Orthopedic Rehabilitation, P.C. at a No-Fault Clinic located at 57-21 Queens Boulevard, Woodside, New York. On May 2, 2019, S.W. underwent an initial examination with Dr. Sotelo-Garza who issued prescriptions for Diclofenac 3% with Lidocaine 5% Ointment with 1 refill and Meloxicam with no refill.  On May 5, 2019, NYRX Pharmacy dispensed and billed for Diclofenac Gel 3% with Lidocaine 5% Ointment and Meloxicam pursuant to prescriptions dated May 2, 2019 by Dr. Sotelo-Garza. Notably, Dr. Sotelo-Garza only documented the prescription of Meloxicam in his examination report.

104.    NYRX Pharmacy typically billed GEICO between $1,179.00 and $2,358.00 for a single tube of Diclofenac Gel 3%, with charges at times exceeding $3,500.00 for a single tube. To-date, NYRX Pharmacy billed GEICO over $3.4 million for Diclofenac Gel 3% alone.

105.    Not surprisingly, the Office of Inspector General of the U.S. Department of Health & Human Services recently issued a report which noted that one of the most common products billed for by pharmacies with questionable billing was diclofenac sodium because, among other reasons, there is a striking difference between the cost of a compounded topical containing diclofenac sodium and a non-compounded version of the same drug. In that same report, the OIG also noted that many pharmacies in New York State are among the most questionable in the nation. See Questioning Billing For Compounded Topical Drugs in Medicare Part D, OEI-02-1600440 (August 2018).

106.    In addition to the egregious volume of Diclofenac Gel 3% dispensed by NYRX Pharmacy, in accordance with the fraudulent scheme discussed above, the Pharmacy Defendants routinely billed GEICO for exorbitantly priced topical Lidocaine 5% Ointment, pursuant to prescriptions solicited from the Prescribing Providers and Clinic Controllers in exchange for kickbacks or other financial incentives.

107.    Lidocaine is a local anesthetic (numbing medication) that works by blocking nerve signals in the body. Lidocaine 5% Ointment is primarily indicated for temporary pain relief associated with minor burns and skin irritations such as sunburn, insect bites, poison ivy, poison oak, poison sumac abrasions of the skin and insect bites, or as a topical anesthetic for minor procedures such as sutures or injections. Lidocaine does not penetrate the skin enough to treat deep musculoskeletal pain.

108.    Excessive dosage or short intervals between doses of Lidocaine 5% Ointment can cause serious adverse effects. Accordingly, patients should be instructed to strictly adhere to the recommended dosage and a single application of Lidocaine 5% Ointment should not exceed 5 grams.

109.    Despite this, the Prescribing Providers never recommended Insureds first use over-the-counter Lidocaine products to treat minor aches and pain which they sustained in fender-bender type motor vehicles accidents. Rather, pursuant to collusive arrangements and predetermined protocols, the Prescribing Providers and Clinic Controllers routinely prescribed to Insureds, or caused the prescription of, Lidocaine 5% Ointment and directed those prescriptions to NYRX Pharmacy.

110.    For example, the Prescribing Providers never recommended Insureds first try commonly available commercial products, such as Icy Hot Lidocaine or Aspercreme with Lidocaine, both of which contain 4% lidocaine and are available in a 2.7 oz. tube at most well-known pharmacy retailers at a mere fraction of the cost, including Rite-Aid and Target for advertised prices in the range of approximately $10.00.

111.    In keeping with the fact that the Pharmacy Defendants submitted bills pursuant to collusive agreements with the Prescribing Providers and Clinic Controllers and pursuant to fraudulent, predetermined and profit-driven treatment protocols, the Lidocaine 5% Ointment prescriptions were often issued contemporaneously to oral medications, such as OTC NSAIDs and muscle relaxers. For example:

- Insured D.R.S. was alleged involved in a motor vehicle accident on June 23, 2019. Thereafter, D.R.S. sought treatment with Epione Medical, P.C. at a No-Fault Clinic located at 218-08 Jamaica Avenue, Queens Village, New York. On June 25, 2019, D.R.S. underwent an initial examination with Dr. Jacobi who issued prescriptions for Lidocaine 5% Ointment, Naproxen and Cyclobenzaprine.  On June 27, 2019, NYRX Pharmacy dispensed and billed for Lidocaine 5% Ointment, Naproxen, and Cyclobenzaprine pursuant to prescriptions dated June 25, 2019 by Dr. Jacobi.

- Insured A.S. was allegedly involved in a motor vehicle accident on January 19, 2019. Thereafter, A.S. sought treatment with Happy Apple Medical Services, P.C. at a No-Fault Clinic at 105-20 Rockaway Beach Blvd., Rockaway, New York.  On June 19, 2019, A.S. underwent an initial examination with Richard Jay Apple, M.D. ("Dr. Apple") who issued prescriptions for Lidocaine 5% Ointment, Celecoxib, and Omeprazole. On June 21, 2019, NYRX Pharmacy dispensed and billed for Lidocaine

5% Ointment, Celecoxib, and Omeprazole pursuant to prescriptions dated June 19, 2019 by Dr. Apple.

- Insured O.R. was allegedly involved in a motor vehicle accident on May 26, 2019. Thereafter, O.R. sought treatment with Dr. Thillainathan at a No-Fault Clinic located at 1849 Utica Avenue, Brooklyn, New York. On May 29, 2019, O.R. underwent an initial examination with Dr. Thillainathan who issued prescriptions for Lidocaine 5% Ointment and Cyclobenzaprine. On June 10, 2019, NYRX Pharmacy dispensed and billed for Lidocaine 5% Ointment and Cyclobenzaprine pursuant to prescriptions dated May 29, 2019 by Dr. Thillainathan.

- Insured Y.R.C. was allegedly involved in a motor vehicle accident on April 11, 2019. Thereafter, Y.R.C. sought treatment with Eastern Medical Practice, P.C. at a No-Fault Clinic located at 82-25 Queens Blvd., Elmhurst, New York. On July 30, 2019, Y.R.C. underwent an examination with Aleksandr Kopach, P.A. ("Kopach") who, on the <u>following</u> day, issued prescriptions for Lidocaine 5% Ointment, Tizanidine, and Ibuprofen.  On August 20, 2019, NYRX Pharmacy dispensed and billed for Lidocaine 5% Ointment, Tizanidine, and Ibuprofen pursuant to prescriptions dated July 31, 2019 by Kopach.

- Insured S.C. was allegedly involved in a motor vehicle accident on January 8, 2019. Thereafter, S.C. sought treatment with Epione Medical, P.C. at a No-Fault Clinic located at 218-08 Jamaica Avenue, Queens Village, New York. On January 10, 2019, S.C. underwent an initial examination with Dr. Jacobi who issued prescriptions for Lidocaine 5% Ointment and Naproxen. On February 7, 2019, NYRX Pharmacy dispensed and billed for Lidocaine 5% and Naproxen pursuant to prescriptions dated January 10, 2019 by Dr. Jacobi.

112.    As with the prescriptions for Diclofenac Gel 3%, the initial examination reports prepared by the Prescribing Providers virtually never set forth the medical basis for the Lidocaine 5% Ointment prescriptions. Likewise, the follow-up examination reports virtually never addressed whether the Lidocaine 5% Ointment prescribed provided any pain relief to the patient or was otherwise effective for the purpose prescribed, to what degree, or whether the patients experienced any side effects.

113.    NYRX Pharmacy typically billed GEICO between $380.50 and $1,522.00 for a single tube of Lidocaine 5% Ointment, and to date, has submitted over $700,000.00 in charges to GEICO seeking reimbursement for Lidocaine 5% Ointment alone.

114.    In further keeping with the fact that the Pharmacy Defendants targeted a specific

set of pharmaceuticals (i.e., the Fraudulent Topical Pain Products) pursuant to collusive

arrangements with the Prescribing Providers and Clinic Controllers and pursuant to fraudulent,

predetermined and profit-driven treatment protocols, the Prescribing Providers issued nearly

identical prescriptions to Insureds involved in a single motor vehicle accident, regardless of the

Insured's individual circumstances or actual injuries.  For example:

- On June 12, 2019, two Insureds J.B. and C.L. were involved in the same underlying accident. Thereafter, J.B. and C.L. sought treatment with MetroCare Medical, P.C. at a No-Fault Clinic located at 71 South Central Avenue, Valley Stream, New York, and underwent examinations with Andrew Patrick, M.D. ("Dr. Patrick"). Notably, Dr. Patrick directed J.B. and C.L. to take the same Fraudulent Pharmaceuticals, namely, Lidocaine 5% Ointment and Tramadol. On June 28, 2019, NYRX Pharmacy dispensed Lidocaine 5% Ointment and Tramadol to J.B. and C.L. pursuant to prescriptions dated June 26, 2019 by Dr. Patrick.

- On October 16, 2018, two Insureds, S.S. and W.H., were involved in the same underlying accident. Thereafter, S.S. and W.H. sought treatment with Metro Pain Specialists, P.C. at a No-Fault Clinic located at 2451 E. Tremont Avenue, Bronx, New York, and underwent initial examinations with Joseph Jimenez, M.D. ("Dr. Jimenez") on October 18, 2018. Notably, Dr. Jimenez directed S.S. and W.H. to take the same Fraudulent Pharmaceuticals, namely, Diclofenac Gel 3% and Lidocaine 5% Ointment. On October 19, 2018 and October 28, 2018, NYRX Pharmacy dispensed and billed for Diclofenac Gel 3% and Lidocaine 5% Ointment, respectively, pursuant to prescriptions for S.S. dated October 18, 2018 by Dr. Jimenez. Similarly, on October 24, 2018 and October 28, 2019, NYRX Pharmacy dispensed and billed for Diclofenac Gel 3% and Lidocaine 5% Ointment, respectively, pursuant to prescriptions for W.H. dated October 18, 2018 by Dr. Jimenez.  Dr. Jimenez also issued additional identical prescriptions for Diclofenac Gel 3% and Cyclobenzaprine to S.S. and W.H.  On November 16, 2018, NYRX Pharmacy dispensed and billed for Diclofenac Gel 3% and Cyclobenzaprine pursuant to prescriptions for S.S. dated November 15, 2018 by Dr. Jimenez. Similarly, on November 18, 2020, NYRX Pharmacy dispensed and billed for Diclofenac Gel 3% and Cyclobenzaprine pursuant to prescriptions for W.H. dated November 15, 2018 by Dr. Jimenez.

- On December 13, 2018, two Insureds, B.D. and P.O. were involved in the same underlying accident. Thereafter, B.D. and P.O. sought treatment with 5 Borough Anesthesia, PLLC at No-Fault Clinics located at 1250 Waters Place, Bronx, New York and 550 Remsen Avenue, Brooklyn, New York, respectively and underwent examinations with David Irfan, N.P. ("Irfan"). Notably, Irfan directed B.D. and P.O. to take the same Fraudulent Pharmaceuticals, namely Diclofenac Gel 3% and

Meloxicam. On January 8, 2019, NYRX Pharmacy dispensed and billed for Diclofenac Gel 3% and Meloxicam pursuant to prescriptions for B.D. and P.O. dated December 31, 2018 by Irfan.

- On September 30, 2018, two Insureds, T.M. and E.M., were involved in the same underlying accident. Thereafter, T.M. sought treatment with Bay Ridge Orthopedic Associates at a No-Fault Clinic located at 108-25 Merrick Blvd., Jamaica, New York, and underwent examinations with Howard Baum, M.D. ("Dr. Baum"). There is no indication that Dr. Baum examined E.M., yet, Dr. Baum directed T.M. and E.M. to take the same Fraudulent Pharmaceuticals, namely, Diclofenac Gel 3% and Celecoxib with 3 refills for each medication. On December 5, 2018, NYRX Pharmacy dispensed and billed for Diclofenac Gel 3% and Celecoxib pursuant to prescriptions for T.M. dated November 27, 2018 by Dr. Baum. Similarly, on December 13, 2018, NYRX Pharmacy dispensed and billed for Diclofenac Gel 3% and Celecoxib pursuant to prescriptions for E.M. dated December 11, 2018 by Dr. Baum.

- On April 26, 2019, two Insureds, A.Z. and R.J., were involved in the same underlying accident. Thereafter, A.Z. and R.J. sought treatment with Center for NeuroRestorative Medicine at a No-Fault Clinic located at 240-19 Jamaica Avenue, Bellerose, New York, and underwent examinations with Jordan Fersel, M.D. ("Dr. Fersel"). Notably, Dr. Fersel directed A.Z. and R.J. to repeatedly take the same Fraudulent Pharmaceutical, namely, Diclofenac Gel 3%. On May 3, 2019, NYRX Pharmacy dispensed and billed for Diclofenac Gel 3% pursuant to prescriptions dated April 30, 2019 by Dr. Fersel. On June 20, 2019, NYRX Pharmacy again dispensed and billed for Diclofenac Gel 3% pursuant to prescriptions dated June 18, 2019 with 1 refill by Dr. Fersel. On July 24, 2019, NYRX Pharmacy dispensed a refill of Diclofenac Gel 3% pursuant to the June 18, 2019 prescription by Dr. Fersel.

115.    The Pharmacy Defendants' egregious billing in predetermined patterns, coupled with the fact that the Prescribing Providers failed to properly document the prescriptions for Diclofenac Gel 3% and Lidocaine 5% Ointment, or the Insureds' use of these medications, further indicates that there was no legitimate medical reason for the Prescribing Providers to have prescribed large volumes of these medications to the Insureds, particularly given the potential for adverse health effects.

### D.  The Fraudulent Lidocaine Patches

116.    As a further part of their scheme, the Pharmacy Defendants routinely billed GEICO for exorbitantly priced pain patches in the form of Lidocaine 5% Patch ("Lidocaine

Patches") pursuant to prescriptions solicited from the Prescribing Providers and Clinic Controllers in exchange for kickbacks or other financial incentives.

117.   In keeping with the fact that the Pharmacy Defendants steered the Prescribing Providers to prescribe the Fraudulent Pharmaceuticals pursuant to predetermined protocols designed to maximize profits without regard for patient care, the Lidocaine Patches were routinely dispensed and billed at exorbitant charges despite the fact that there are other, less expensive, commercially available FDA-approved patches.

118.   Notably, topical pain patches in which the primary ingredient is lidocaine are mainly used to treat chronic post-herpetic neuropathic pain (i.e., continued nerve pain after a patient recovers from shingles), although studies have shown that any relief these patches provide – beyond topical anesthetic relief – is more attributable to its placebo effect rather than the pharmacological action of patches themselves.  In fact, while the application of pain patches in which the primary ingredient is lidocaine provides sufficient absorption to cause an anesthetic effect, it is insufficient to produce a complete sensory block.

119.   Nevertheless, the Prescribing Providers routinely prescribed the Fraudulent Pain Patches to Insureds for sprain/strain injuries sustained in fender-bender type motor vehicle accidents.

120.   Like the prescriptions for Lidocaine 5% Ointment, the Prescribing Providers never recommended Insureds first use OTC patches containing lidocaine – which are available to treat their often minor sprain/strain injuries. Rather, pursuant to collusive arrangements and predetermined protocols, the Prescribing Providers routinely prescribed Insureds exorbitantly priced prescription Lidocaine Patches, which were dispensed by NYRX Pharmacy.

121.     As with the prescriptions for the other Fraudulent Topical Pain Products, the initial examination reports prepared by the Prescribing Providers virtually never set forth the medical basis for the prescriptions. Likewise, the follow-up examination reports virtually never addressed whether the Lidocaine Patches prescribed provided any pain relief to the patient or were otherwise effective for the purpose prescribed, to what degree, or whether the patients experienced any side effects.

122.     In keeping with the fact that the Pharmacy Defendants acted with gross indifference to patient care and safety, the patients were generally not instructed on the safe use, side effects or risks associated with the Lidocaine Patches. Moreover, despite these risks, as demonstrated in the claims examples throughout this Complaint, the Prescribing Providers regularly prescribed, and the Pharmacy Defendants regularly dispensed, Lidocaine Patches contemporaneously to other Fraudulent Pharmaceuticals.

123.     The Pharmacy Defendants typically billed GEICO between $308.10 and $925.20 for each prescription of Lidocaine Patches. To-date, the Pharmacy Defendants' billing submitted through NYRX Pharmacy to GEICO exceeded $190,000.00 in claims seeking reimbursement for Lidocaine Patches.

###### E.   <u>The Exploiting of Patients for Financial Gain Through the Illegal, Collusive Arrangements Between The Pharmacy Defendants, Prescribing Providers and the Clinic Controllers</u>

124.     To effectuate the fraudulent scheme, the Pharmacy Defendants steered the Prescribing Providers and Clinic Controllers to routinely prescribe and direct prescriptions to NYRX Pharmacy for large volumes of the Fraudulent Topical Pain Products pursuant to their collusive arrangements, which egregiously inflated the charges submitted to GEICO.

125.   New York's statutory framework provides, among other things, that pharmacies and licensed medical professionals are prohibited from (i) "exercising undue influence" on a patient by promoting the sale of drugs so as to exploit the patient for the financial gain of the licensee or of a third party, and (ii) "directly or indirectly" giving, soliciting, receiving, or agreeing to receive any fee or other consideration to or from a third party in connection with the performance of professional services.

126.   Here, the Pharmacy Defendants colluded with Prescribing Providers and Clinic Controllers associated with various No-Fault Clinics, which treat thousands of Insureds, to have the Prescribing Providers, prescribe, or purport to prescribe, the Fraudulent Pharmaceuticals, including the Fraudulent Topical Pain Products, and then have those prescriptions directed to NYRX Pharmacy so that the Pharmacy Defendants could bill GEICO huge sums.

127.   The Prescribing Providers prescribed, or purported to prescribe, the Fraudulent Pharmaceuticals to patients of No-Fault Clinics, while the Pharmacy Defendants dispensed, or purported to dispense the Fraudulent Pharmaceuticals, despite their knowledge that they were involved in illegal, collusive arrangements designed to exploit the patients for financial gain; the Fraudulent Pharmaceuticals were often being prescribed without regard to pharmacologic outcomes; the Fraudulent Pharmaceuticals were often being prescribed with gross indifference to patient health, care and safety; the Fraudulent Topical Pain Products were prescribed as a matter of course without any recommendation that patients first try OTC products; and that the Fraudulent Pharmaceuticals were prescribed without attention to cost and fiscal responsibility, given that there are FDA-approved drugs available and appropriate for the particular patients at significantly less cost.

128.    The Pharmacy Defendants on occasion supplied the Prescribing Providers and the Clinic Controllers with Fraudulent Prescription Forms to steer the Prescribing Providers to prescribe the Fraudulent Pharmaceuticals, including the Fraudulent Topical Pain Products that NYRX Pharmacy dispensed, to patients of the No-Fault Clinic and direct those prescriptions to the Pharmacy Defendants.

129.    The purpose of the Pharmacy Defendants supplying the Prescribing Providers and Clinic Controllers with the Fraudulent Prescriptions Forms was so that the Prescribing Providers could repeatedly issue predetermined and/or unnecessary prescriptions for the exorbitantly priced Fraudulent Topical Pain Products that NYRX Pharmacy "specialized" in dispensing in order to exploit the Insureds' No-Fault Benefits.

130.    The Prescribing Providers and Clinic Controllers virtually never gave the Insureds the option to use a pharmacy of their choosing, rather the Prescribing Providers and Clinic Controllers directed the prescriptions for the Fraudulent Pharmaceuticals to NYRX Pharmacy, notwithstanding that: (i) in many instances, the No-Fault Clinics and the patient themselves were located far from NYRX Pharmacy in Fresh Meadows, Queens; and (ii) there were countless other pharmacies located much closer to the No-Fault Clinics and the patients' residences.

131.    NYRX Pharmacy purported to mail or deliver the Fraudulent Pharmaceuticals directly to the Insureds' residences.

132.    Alternatively, the Insureds were given the Fraudulent Pharmaceuticals directly from the Clinic Controllers or front desk staff at the various No-Fault Clinics, without ever seeing the prescription.

133.    The Prescribing Providers and Clinic Controllers did not give the Insureds the option to identify a pharmacy of their choosing to ensure that the prescriptions were filled by

NYRX Pharmacy, and to ensure that the Pharmacy Defendants benefitted financially from the prescriptions.

134.    The Prescribing Providers had no legitimate medical reason to prescribe the Fraudulent Pharmaceuticals in large quantities to their patients.

135.    The Prescribing Providers and Clinic Controllers had no legitimate reason to direct the prescriptions for the Fraudulent Pharmaceuticals to NYRX Pharmacy rather than to a multitude of other pharmacies that were equally capable of dispensing the prescriptions and often more convenient to many of the patients.

136.    The Pharmacy Defendants had no legitimate reason to dispense, or purport to dispense, the Fraudulent Pharmaceuticals that were (i) often prescribed and dispensed without regard to pharmacologic outcomes; (ii) prescribed and dispensed with gross indifference to patient health, care and safety; (iii) prescribed and dispensed as a matter of course without any recommendation that patients first try over-the-counter products; and (iv) prescribed and dispensed without any attention to cost and fiscal responsibility, because, among other things, all pharmacists in New York are required to conduct a prospective drug review before each prescription is dispensed, which review shall include screening for therapeutic duplication, drug-drug interactions, including serious interactions with over-the-counter drugs, incorrect drug dosage or duration of drug treatment, drug-allergy interactions, and clinical abuse or misuse.

137.    The Prescribing Providers and the Clinic Controllers would have not engaged in the illegal, collusive arrangements with the Pharmacy Defendants in violation of New York law, including using the Fraudulent Prescription Forms, intentionally prescribing the Fraudulent Pharmaceuticals, and directing those prescriptions to NYRX Pharmacy, unless they profited

from their participation in the illegal scheme either by way of direct kickbacks or other financial incentives, such as employment at a No-Fault Clinic.

138.    But for the payment of kickbacks, or other financial incentive from the Pharmacy Defendants, the Prescribing Providers would not have prescribed the Fraudulent Pharmaceuticals, or the volume of the Fraudulent Topical Pain Products, and the Prescribing Providers and Clinic Controllers would not have directed the prescriptions to NYRX Pharmacy.

139.    The Pharmacy Defendants, Prescribing Providers, and Clinic Controllers have affirmatively concealed the particular amounts paid for the kickbacks since such kickbacks are in violation of New York law.

140.    Nevertheless, based on the circumstances surrounding the illegal, collusive arrangements, the Pharmacy Defendants paid, and continue to pay, a financial kickback or provide other financial incentives, and the Prescribing Providers and Clinic Controllers received, and continue to receive, a financial kickback or other financial incentives, for each of the particular prescriptions for the Fraudulent Pharmaceuticals that are dispensed by NYRX Pharmacy.

141.    Upon information and belief, the payment of kickbacks was made at or near the time the prescriptions were issued.

## IV.    The Fraudulent Billing the Pharmacy Defendants Submitted or Cause to be Submitted to GEICO

142.    Every prescription product, whether a brand name or generic drug, has a designated national drug code ("NDC") – unique 10-digit code that identifies the drug itself, the vendor of the drug and the quantity in which the drug was packaged. Each NDC number has an assigned Average Wholesale Price ("AWP").

143.    Each NDC (and, thus, the AWP) for a particular prescription product differs depending on both the particular supplier the drug is purchased from and the quantity in which the drug is obtained. The same drug can have a different NDC number if it is purchased from a different supplier and/or in different quantities.

144.    Pursuant to 12 N.Y.C.R.R. §§ 440.5(a) and (d) (the "Pharmacy Fee Schedule"), for each brand name drug (or ingredient included in a compounded product) a provider may charge no more than the AWP assigned to that particular NDC on the day the drug was dispensed minus 12% of the AWP, plus a single dispensing fee of $4.00.

145.    For each generic drug (or the ingredient included in a compounded product) the provider may charge no more than the AWP assigned to that particular NDC on the day the drug was dispensed minus 20% of the AWP, plus a single dispensing fee of $5.00.

146.    The Pharmacy Defendants solicited the Prescribing Providers and Clinic Controllers to provide them with voluminous prescriptions for the Fraudulent Topical Pain Products so they could bill GEICO and other New York No-Fault insurers for the exorbitantly priced pharmaceuticals products.

147.    The Pharmacy Defendants intentionally targeted the Fraudulent Topical Pain Products, with extremely expensive assigned AWP's or "list prices", in order to inflate the billing submitted through NYRX Pharmacy so as to maximize their profits.

148.    The Defendants purported to provide the Fraudulent Pharmaceuticals, including the Fraudulent Topical Pain Products, directly to GEICO Insureds, and sought reimbursement directly from GEICO pursuant to executed "Assignment of Benefit" ("AOB") forms.

149.    In support of their charges, the Pharmacy Defendants typically submitted: (i) the Prescribing Providers' prescriptions; (ii) a "No-Fault" form known as an NF-3 Form, which

includes the purported NDC numbers, units, and corresponding charges for each drug product or ingredient; (iii) a delivery receipt; and (iv) the AOB assigning the Insureds' benefits to the Pharmacy Defendants.

150.    The NDC numbers listed on the NF-3 Forms submitted by the Pharmacy Defendants identify the assigned AWPs for each of the prescription drugs or compounded drug ingredients.

151.    The Pharmacy Defendants never submitted their wholesale purchase invoices demonstrating: (i) how much the Pharmacy Defendants actually paid the supplier for the Fraudulent Pharmaceuticals; and (ii) whether the Pharmacy Defendants actually purchased the Fraudulent Pharmaceuticals with the particular NDC number used in the billing, representing purchases from a particular supplier in a particular quantity.

152.    In fact, the Pharmacy Defendants never actually paid the targeted and egregious assigned AWP of the Fraudulent Pharmaceuticals that they dispensed, or purported to dispense, because it is not a true representation of the actual market price and is far above the actual acquisition cost for the Fraudulent Pharmaceuticals.

153.    Nevertheless, the Pharmacy Defendants billed GEICO and other No-Fault insurers egregious amounts far surpassing the cost of a wide variety of other medications that are FDA-approved and proven effective.

## V.    The Pharmacy Defendants' Submission of Fraudulent NF-3 Forms to GEICO

154.    To support the fraudulent charges, statutorily prescribed claim forms for No-Fault Benefits have been submitted to GEICO by and on behalf of NYRX Pharmacy seeking payment for the pharmaceuticals for which it is ineligible to receive payment.

155.    These forms, including NF-3 forms, HCFA-1500 forms and other supporting records that the Pharmacy Defendants submitted or caused to be submitted to GEICO, were false and misleading in the following material respects:

(i)     NF-3 forms, HCFA-1500 forms, and other supporting records uniformly misrepresented to GEICO that the Fraudulent Pharmaceuticals were medically necessary and intended for genuine patient care and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12). In fact, the Fraudulent Pharmaceuticals were the product of predetermined fraudulent protocols designed to exploit the patients for financial gain without regard for genuine patient care;

(ii)    the NF-3 forms, HCFA-1500 forms, and other supporting records uniformly misrepresented to GEICO that the Pharmacy Defendants were in compliance with all material licensing requirements and, therefore, were eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12). In fact, the Pharmacy Defendants did not comply with all material licensing requirements in that the Pharmacy Defendants engaged in illegal, collusive relationships with the Prescribing Defendants and Clinic Controllers in order to steer voluminous and illegal prescriptions to NYRX Pharmacy for the Fraudulent Pharmaceuticals, in exchange for the payment of kickbacks and other financial incentives;

(iii)   the NF-3 forms, HCFA-1500 forms, and other supporting records, uniformly mispresented to GEICO that the Pharmacy Defendants were in compliance with all material licensing laws, and therefore, were eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12). In fact, the Pharmacy Defendants did not comply with all material licensing requirements in that the Pharmacy Defendants intentionally targeted a specific set of pharmaceutical products to dispense in large volumes to Insureds with exorbitant charges, in place of other effective, less costly pharmaceuticals; and

(iv)    the NF-3 forms, HCFA-1500 forms, and other supporting records uniformly misrepresented to GEICO that the Pharmacy Defendants were in compliance with all material licensing requirements and, therefore, were eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12). In fact, the Pharmacy Defendants did not comply with all material

licensing requirements in that they dispensed the Fraudulent Pharmaceuticals pursuant to illegal and invalid prescriptions.

## VI. The Pharmacy Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance

156. The Pharmacy Defendants are legally and ethically obligated to act honestly and with integrity in connection with the provision of pharmaceutical products to the Insureds and the billing they submit or cause to be submitted to GEICO seeking reimbursement for these products.

157. To induce GEICO to promptly pay the charges for the Fraudulent Pharmaceuticals, the Pharmacy Defendants have gone to great lengths to systematically conceal their fraud.

158. Specifically, the Pharmacy Defendants knowingly misrepresented and concealed facts in an effort to prevent discovery that: (i) the Fraudulent Pharmaceuticals were prescribed and dispensed pursuant to predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care; and (ii) the Pharmacy Defendants were involved in collusive, kickback arrangements with the Prescribing Providers and Clinic Controllers designed to generate voluminous prescriptions solely to maximize the billing to GEICO and other New York insurance companies.

159. The Pharmacy Defendants also billed for the Fraudulent Pharmaceuticals based on purported prescriptions from multiple Prescribing Providers operating from multiple No-Fault Clinics in order to reduce the amount of billing based on any single license, and further billed for multiple drug products, including various oral medications, in order to conceal the scheme to exploit the Insureds for financial gain.

160.    The billing and supporting documentation submitted by the Pharmacy Defendants for the Fraudulent Pharmaceuticals, when viewed in isolation, does not reveal its fraudulent nature.

161.    The Pharmacy Defendants have hired law firms to pursue collection of the fraudulent charges from GEICO and other insurers. These law firms routinely file expensive and time-consuming litigation against GEICO and other insurers if the charges are not promptly paid in full.  In fact, the Pharmacy Defendants continue to have legal counsel pursue collection against GEICO and other insurers without regard for the fact that NYRX Pharmacy has ceased active operations, is no longer registered as an active pharmacy with New York State Department of Education, and has been engaged in fraud.

162.    GEICO is under statutory and contractual obligations to promptly and fairly process claims within 30 days. The facially-valid documents that were submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations described above, were designed to and did cause GEICO to rely upon them. As a result, GEICO has incurred damage approximately $434,000.00 representing payments made to GEICO based upon the fraudulent charges submitted by the Pharmacy Defendants, which damages are to be trebled under 18 U.S.C. § 1962(c), et al. to $1,302,000.00.

163.    Based upon the Pharmacy Defendants' material misrepresentations and other affirmative acts to conceal fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

## THE FIRST CLAIM FOR RELIEF
### Against All Defendants
### (Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)

164.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

165.    There is an actual case in controversy between GEICO and the Pharmacy Defendants regarding approximately $3,441,000.00 in fraudulent billing for the Fraudulent Pharmaceuticals that the Pharmacy Defendants submitted or caused to be submitted to GEICO through NYRX Pharmacy.

166.    NYRX Pharmacy has no right to receive payment for any pending bills submitted to GEICO because NYRX Pharmacy billed for pharmaceutical products that were medically unnecessary, and were prescribed and dispensed pursuant to predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard to genuine patient care.

167.    NYRX Pharmacy has no right to receive payment for any pending bills submitted to GEICO because the Pharmacy Defendants participated in illegal, collusive agreements in which the Pharmacy Defendants steered the Prescribing Providers and Clinic Controllers to direct illegal prescriptions for the Fraudulent Pharmaceuticals to NYRX Pharmacy in exchange for unlawful kickbacks and other financial incentives.

168.    NYRX Pharmacy has no right to receive payment for any pending bills submitted to GEICO because the Pharmacy Defendants intentionally targeted a specific set of pharmaceutical products (i.e., the Fraudulent Topical Pain Products) that NYRX Pharmacy dispensed in large volumes to Insureds with exorbitant charges, in place of other effective, less costly pharmaceuticals solely for financial gain in violation of law.

169.     NYRX Pharmacy has no right to receive payment for any pending bills submitted to GEICO because the Pharmacy Defendants made and continue to make false and fraudulent misrepresentations to GEICO by submitting or causing to be submitted charges for the Fraudulent Pharmaceuticals dispensed by NRYX Pharmacy pursuant to illegal, invalid, and duplicitous prescriptions.

170.     Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that NRYX Pharmacy has no right to receive payment for any pending bills submitted to GEICO.

**THE SECOND CLAIM FOR RELIEF**
**Against Avulov and John Doe Nos. "1" through "5"**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

171.     GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

172.     NYRX Pharmacy is an ongoing "enterprise", as that term is defined in 18 U.S.C § 1961(4), that engages in activities which affect interstate commerce.

173.     Avulov and John Doe Nos. "1" through "5" knowingly have conducted and/or participated, directly or indirectly, in the conduct of NYRX Pharmacy's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of United States mail to submit or cause to be submitted thousands of fraudulent charges for nearly two years, seeking payments that NYRX Pharmacy was not eligible to receive under the No-Fault Laws because: (i) the billed-for services were not medically necessary and/or the product of predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care; (ii) the Pharmacy Defendants participated in illegal, collusive relationships in which the Pharmacy Defendants

steered the Prescribing Providers and Clinic Controllers to direct illegal prescriptions for the Fraudulent Pharmaceuticals to NYRX Pharmacy in exchange for unlawful kickbacks and other financial incentives; (iii) the Pharmacy Defendants intentionally targeted a specific set of pharmaceuticals that they dispensed in large volumes to Insureds with exorbitant charges, in place, of other effective, less costly pharmaceuticals solely for financial gain, in violation of law; and (iv) the billed-for services were the product of illegal, invalid, and duplicitous prescriptions. A sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1".

174.    NYRX Pharmacy's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Avulov and John Doe Nos. "1" through "5" operated NYRX Pharmacy, inasmuch as NYRX Pharmacy was never eligible to bill for or collect No-Fault Benefits, and acts of mail fraud therefore were essential in order for NYRX Pharmacy to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Pharmacy Defendants actively continue to attempt collection on the fraudulent billing submitted through NYRX Pharmacy to the present day.

175.    NYRX Pharmacy is inherently unlawful acts inasmuch as its very existence is an unlawful act, considering that it was created to exploit the New York "No-Fault" insurance system; engage in illegal, collusive arrangements involving prescriptions for the Fraudulent Pharmaceuticals; and bill pursuant to predetermined fraudulent protocols solely to financially enrich the Pharmacy Defendants. These inherently unlawful acts are taken by NYRX Pharmacy

in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent No-Fault billing.

176.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid approximately $434,000.00 pursuant to the fraudulent bills submitted by the Pharmacy Defendants.

177.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fee pursuant to 18 U.S.C. § 1961(4), any other relief the Court deems just and proper.

## THE THIRD CLAIM FOR RELIEF
### Against All Defendants
### (Common Law Fraud)

178.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

179.    The Pharmacy Defendants intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent charges seeking payment for the Fraudulent Pharmaceuticals under the name of NYRX Pharmacy.

180.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that the billed-for services were medically necessary and properly billed when in fact the billed-for services were not medically necessary and/or were the product of predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care; (ii) in every claim, the representation that NYRX Pharmacy was acting in accordance with material licensing requirements and, therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact the Pharmacy Defendants

participated in illegal, collusive relationships in which the Pharmacy Defendants steered the Prescribing Providers and Clinic Controllers to direct illegal prescriptions for the Fraudulent Pharmaceuticals to NYRX Pharmacy in exchange for unlawful kickbacks or other financial incentives; (iii) in every claim, the representation that NYRX Pharmacy was acting in accordance with material licensing requirements and, therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact the Pharmacy Defendants intentionally targeted a specific set of pharmaceutical products that they could dispense in large volumes to Insureds with exorbitant charges, in place of other effective, less costly pharmaceuticals solely for financial gain, in violation of law of New York State regulatory and licensing requirements; and (iv) in every claim, the representation that NYRX Pharmacy was acting in accordance with material licensing requirements and, therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact the billed-for services were the product of illegal, invalid, and duplicitous prescriptions, rendering the pharmacy ineligible reimbursement for No-Fault benefits.

181.    The Pharmacy Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through NYRX Pharmacy that were not compensable under the No-Fault Laws.

182.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid approximately $434,000.00 pursuant to the fraudulent bills submitted, or caused to be submitted, by the Pharmacy Defendants through NYRX Pharmacy.

183.    The Pharmacy Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

184.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**THE FOURTH CLAIM FOR RELIEF**
**Against All Defendants**
**(Unjust Enrichment)**

185.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

186.    As set forth above, the Pharmacy Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

187.    When GEICO paid the bills and charges submitted by or on behalf of NYRX Pharmacy for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Pharmacy Defendants' improper, unlawful, and/or unjust acts.

188.    The Pharmacy Defendants have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that the Pharmacy Defendants voluntarily accepted and profited from, as a result of, among other things, the payments received and the receipt of kickback payments, notwithstanding their improper, unlawful, and unjust fraudulent billing scheme.

189.    The Pharmacy Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

190.    By reason of the above, the Pharmacy Defendants have been unjustly enriched in an amount to be determined at trial, but in the approximate amount of $434,000.00.

WHEREFORE, Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company demand that a judgment be entered in their favor and against the Defendants, as follows:

A.  On the First Claim for Relief against the Pharmacy Defendants, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that the Defendants have no right to receive payment for any pending bills, amounting to approximately $3,441,000.00 submitted to GEICO;

B. On the Second Claim For Relief against Avulov, compensatory damages in favor of GEICO in an amount to be determined at trial but approximately $434,000.00, together with treble damages, punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

C. On the Third Claim For Relief against all the Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but approximately $434,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

D. On the Fourth Claim for Relief against all the Defendants, a recovery in favor of GEICO in an amount to be determined at trial but approximately $434,000.00, together with punitive damages.

Dated:  Uniondale, New York
        December 1, 2020

RIVKIN RADLER LLP

By:   */s/ Michael A. Sirignano*
       Michael A. Sirignano (MS 5263)
       Barry I. Levy (BL 2190)
       Jennifer Abreu (JA 3218)
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs, Government*
*Employees Insurance Company, GEICO*
*Indemnity Company GEICO General*
*Insurance Company and GEICO Casualty*
*Company*